The Honorable Dennis Young State Representative P.O. Box 1835 Texarkana, Arkansas 75504-1835
Dear Representative Young:
You have requested an Attorney General opinion concerning a city's procurement of professional engineering and surveying services in two factual scenarios.
First Scenario
In correspondence attached to your opinion request, the following background information for your first set of questions is given:
 Sometime prior to June 12, 1997 NRS Consulting Engineers (NRS) during discussions concerning various specific drainage projects told the City Manager and Public Works Director for the City of Texarkana, Arkansas (City) that they should consider having an overall drainage study done for the City as they had recently done a study for the City of El Dorado and that they thought this could be done for around $10,000 more than the individual projects under consideration. Subsequently and on June 12, 1997 the City's staff sent out a Request for Qualifications (RFQ) for engineering services in connection with an overall drainage study for the City. Following an evaluation of the proposals received in response to the RFQ the staff recommended NRS be ranked first and that they be authorized by the City's Board of Directors (Board) to enter into negotiations with them. The Board on August 4, 1997 passed Resolution No. 4050 instructing the City staff to enter into negotiations with the second ranked firm; Hall, Hall Harper (Hall)
 The City staff presented Hall with guidelines from the University of Tennessee (UT) to aid in developing a scope of work for the study. For approximately 5 months of the City and Hall developed and refined the scope of work. Cost estimates for services to be performed ranged from $156,500 to $21,700. The City broke off negotiations with Hall on or about January 20, 1998 and was authorized by the Board to entered into negotiations with NRS. An article in the Texarkana Gazette on January 25, 1998 prior to any meetings between the City and NRS told of the commencement of negotiations with NRS and reported that the City Manager had said that NRS indicated it could do the [study] for about $16,000. NRS was not given the UT guidelines and proposed to the city an outline of work similar to that developed during the Hall negotiations.
 On March 16, 1998 the Board approved by Resolution No. 4138 a contract with NRS for engineering services associated with development of a stormwater/drainage masterplan on an hourly basis not to exceed $27,500, with direct costs associated with printing not to exceed $5,000.
Regarding the foregoing factual scenario, you have presented the following questions:
 Did NRS proffer a price prior to definition of the scope of work and negotiations? Did the City follow A.C.A. § 19-11-801, -802, and -805 regarding prohibition against competitive bidding and did it negotiate to acquire the services at fair and reasonable prices?
The question of when NRS proffered a price in relation to the occurrence of other events is entirely a question of fact, which the Office of the Attorney General is not authorized to determine. Numerous items of evidence could be presented from the various parties to show when the pertinent events occurred, when discussions took place that would constitute negotiations, and when a price was officially "proffered." Only a court is in a position to evaluate factual information of this nature and to make a determination as to what the evidence actually proves. For this reason, I am unable to opine in response to this question.
The question of whether the City violated the prohibition against competitive bidding, as stated in A.C.A. § 19-11-801, -802, and -805, also involves questions of fact. I am therefore unable to opine conclusively with regard to this matter. However, I will set forth the applicable law for your consideration in evaluating the issue.
The pertinent parts of A.C.A. § 19-11-801, -802, and -805 state, respectively:
19-11-801. Policy.
 (a) It is the policy of the State of Arkansas and political subdivisions that the state and political subdivisions shall negotiate contracts for professional services on the basis of demonstrated competence and qualifications for the type of services required and at fair and reasonable prices and to prohibit the use of competitive bidding for the procurement of professional services.
* * *
 (c) For purposes of this subchapter, the term "professional services" shall include legal, architectural, engineering, land surveying, and such other consulting services as the political subdivision shall designate by two-thirds vote of its governing body.
 19-11-802. Annual statements of qualifications and performance data — Restrictions on competitive bidding.
 (a) In the procurement of professional services, a political subdivision which utilizes such services may encourage firms engaged in the lawful practice of these professions to submit annual statements of qualifications and performance data to the political subdivision or may request such information as needed for a particular public project.
 (b) The political subdivision shall evaluate current statements of qualifications and performance data of firms on file or may request such information as needed for a particular public project whenever a project requiring professional services is proposed.
 (c) The political subdivision shall not use competitive bidding for the procurement of professional services.
 19-11-805. Negotiation of contracts.
 (a) For the basis of negotiations, the political subdivisions and the selected firm shall jointly prepare a detailed, written description of the scope of the proposed services.
 (b) If the political subdivision is unable to negotiate a satisfactory contract with the firm selected, negotiations with that firm shall be terminated. The political subdivision shall then undertake negotiations with another of the qualified firms selected. If there is a failing of accord with the second firm, negotiations with such firm shall be terminated. The political subdivision shall undertake negotiations with the third qualified firm.
 (c) If the political subdivision is unable to negotiate a contract with any of the selected firms, the agency shall reevaluate the necessary professional services, including the scope and reasonable fee requirements, again compile a list of qualified firms, and proceed in accordance with the provisions of this subchapter.
A.C.A. § 19-11-801, -802, and -805.
The Arkansas Supreme Court interpreted the above-quoted statutes inGraham v. Forrest City Housing Authority, 304 Ark. 632, 803 S.W.2d 923
(1991). In that case, it was argued that a city violated the prohibition against competitive bidding because its request for proposals from engineering firms for a construction project to correct a soil erosion problem required that the firms submit, along with other information, an estimated price for their services. The court agreed with the argument, and held that the city had violated the prohibition by requiring the submission of price information before it had selected a qualified firm for the project.
In interpreting the statutes quoted above, the court found that the prohibition against competitive bidding was directed at the consideration of price in selecting a firm. The purpose of these statutes, the court held, was to require that firms be selected on the basis of qualifications rather than price, and to require that fair and reasonable prices be negotiated.
Under the holding of Graham v. Forrest City, therefore, the question of whether the prohibition against competitive bidding has been violated requires a determination of certain questions of fact, including whether the city has required the submission of price information prior to the selection of a qualified firm, and whether such price information was a factor in the selection process. These are the questions of fact that must be considered in order to evaluate whether the City of Texarkana violated the prohibition against competitive bidding in the scenario that you have described. Again, I am not authorized to determine questions of fact, and therefore cannot opine conclusively in response to this question.
Finally, the question of whether the City of Texarkana negotiated for fair and reasonable prices is also entirely a question of fact that I cannot determine. How the parties arrived at a price for the project, and how that price compares with others in the market for similar services are matters that can only be determined on the basis of factual evidence presented by the interested parties.
Second Scenario
In the correspondence attached to your opinion request, the following background information for your second question is given:
 On March 6, 1998 the City issued a RFQ for engineering surveys and other design engineering services in connection with the extension of Jefferson Avenue. The RFQ stated that the firms submitting proposals would be evaluated on the basis of having had property owner surveys reviewed by the Arkansas Department of Highways and Transportation (ADHT) and other criteria.
 The City Manager presented the proposals received by the City to the Board at its regular meeting of April 6, 1998. He stated that the City's staff had not reviewed the proposals and had no recommendation. Following a brief discussion Director Haze Hudson moved to select the firm Murray, Thomas Griffin which has no experience with ADHT within the last five years as the engineering firm for the project. Motion was seconded and approved on a five to two vote.
 A resolution to approve a contract not to exceed $10,000 was included in the consent agenda of the City Board's meeting of April 20, 1998. This resolution was pulled from the consent agenda and subsequently tabled in order to review with the firm the requirements of work to be performed.
Regarding the foregoing factual scenario, you have presented the following question:
 Did the City follow A.C.A. § 19-11-801, -803, and -804 regarding evaluation of qualifications and selection?
I must note as an initial matter that it appears from the facts presented to us that the City may not have completed its selection process, and that, therefore, the question of whether the City has complied with the law in that process may be premature. That is, it is conceivable, under the facts presented to us, that the City may be in the process of complying with the statutory selection requirements.
Assuming that your question is whether the City has, up to this point in the selection process, considered all of the required factors in making its selection decision, I cannot answer it, because it is a question of fact. However, I will set forth the pertinent requirements of the law for your consideration.
The provisions of A.C.A. § 19-11-801 are set forth above in response to Question 1. The provisions of A.C.A. § 19-11-803 and -804 state, respectively:
19-11-803. Evaluation of qualifications.
 In evaluating the qualifications of each firm, the political subdivision shall consider:
 (1) The specialized experience and technical competence of the firm with respect to the type of professional services required;
 (2) The capacity and capability of the firm to perform the work in question, including specialized services, within the time limitations fixed for the completion of the project;
 (3) The past record of performance of the firm with respect to such factors as control of costs, quality of work, and ability to meet schedules and deadlines; and
 (4) The firm's proximity to and familiarity with the area in which the project is located.
 19-11-804. Selection.
 The political subdivision shall select three (3) qualified firms. The political subdivision shall then select the firm considered the best-qualified and capable of performing the desired work and negotiate a contract for the project with the firm selected.
A.C.A. § 19-11-803 and -804.
In order to determine whether the City has complied with the requirements of A.C.A. § 19-11-803 and -804 and with the policy stated in A.C.A. §19-11-801, it will be necessary to consider evidence showing the qualifications of the firms who presented proposals, the qualifications required for the project in question, and the particular qualifications that the City considered in making its selection. It will also be necessary to consider evidence showing whether the City selected three qualified firms, or whether it selected only the one referenced in your correspondence. None of this information is evident from the facts presented to us. Moreover, only a court is qualified to determine, on the basis of evidence presented, whether the City, as a factual matter, has complied with the requirements of these statutes.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Suzanne Antley.
Sincerely,
WINSTON BRYANT Attorney General
WB:SBA/cyh